UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MT. HAWLEY INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>ASSOCIATED INDUSTRIES INSURANCE COMPANY and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.  5:18-cv-00576-KES<br><br>MEMORANDUM OPINION AND ORDER GRANTING SUMMARY ADJUDICATION |

## I.

## INTRODUCTION

In January 2018, Plaintiff Mt. Hawley Insurance Company ("Mt. Hawley") filed in San Bernardino Superior Court the instant action for equitable contribution, indemnification, and declaratory relief against Associated Industries Insurance Company ("AIIC").  (Dkt. 1 at 1, 6.[1])  In March 2018, AIIC removed the action to federal court based on diversity jurisdiction.  (Id. at 2.)  In April 2018, the parties consented to proceed before the assigned Magistrate Judge.  (Dkt. 13.)

---

[1] All page citations are to the CM/ECF pagination.

1

On June 13, 2018, Mt. Hawley moved for summary adjudication of the issue of duty to defend.[2] (Dkt. 19.) Mt. Hawley argues that undisputed facts show AIIC has a duty to defend Mt. Hawley's insured, Oakview Constructors, Inc. ("Oakview"), in an ongoing personal injury lawsuit. (Id.) In opposition, AIIC argues that "Mt. Hawley is not entitled to any relief because AIIC's named insured, [Whitehead Construction, Inc. ("Whitehead")], did not cause the injury which is the subject of the underlying action." (Dkt. 22 at 7-8.)

For the reasons discussed below, Mt. Hawley's motion is GRANTED.

## II.

## SUMMARY OF UNDISPUTED FACTS

### A. The Construction Project.

Oakview was the general contractor for a construction project known as the City Yard Expansion (the "Project") in Rancho Cucamonga, California. (Dkt 19-2, Separate Statement of Undisputed Material Facts ["SSUMF"] 1].) John Field is Oakview's President and was the Project's superintendent. (SSUMF 49, 50.)

Oakview engaged subcontractors to work at the Project, including Franklin Mechanical Systems, Inc. ("Franklin"), which was generally responsible for heating, ventilation, and air conditioning ("HVAC"), and Whitehead, which was generally responsible for doors. (SSUMF 2, 12.) Per the subcontract describing Whitehead's scope of work (Dkt. 19-3 at 23-30 [the "Subcontract"]), Whitehead was required to "complete in a good and workmanlike manner all of the Specification Sections 08110 – Hollow Metal Doors and Frames, 08211 – Flush Wood Doors and 08710 – Door Hardware and Installation … and in connection

---

[2] AIIC interprets Mt. Hawley's motion as also asking this Court to decide whether AAIC has a duty to *indemnify* Oakview. (See Dkt. 22 at 19.) The motion does not encompass that issue. (See also Dkt. 25 at 2 [Mr. Hawley affirms in its reply that the sole issue before the Court is AIIC's duty to defend, not AIIC's indemnification obligation]).

therewith … to furnish all supervision, labor, material, equipment, … and any other services or acts in accordance with" Project documents listed in the Subcontract. (Dkt. 19-3 at 23, ¶ 1.)

The specifications for hollow metal doors and frames contain the following installation requirements:

PART 3 – EXECUTION

3.1 EXAMINATION

    A. Examine supporting structure and conditions under which hollow metal is to be installed. Do not proceed with installation until unsatisfactory conditions have been corrected.

3.2 INSTALLATION

    A. Install hollow metal in accordance with reviewed shop drawings and manufacturer's printed instructions. Securely fasten and anchor work in place without … unsatisfactory or defacing workmanship. Set hollow metal plumb, level, square to proper elevations, true to line and eye. Set clips and other anchors with Ramset "shot" anchors or drill in anchors as approved. Units and trim shall be fastened tightly together, with neat, uniform and tight joints.

    B. Placing Frames: Set frames accurately in position, plumbed, aligned, and brace securely until permanent anchors are set. After wall construction is complete, remove temporary braces and spreaders leaving surfaces smooth and undamaged. In masonry construction, building-in of anchors and grouting of frames with mortar is specified in Section 04220 – Concrete Unit Masonry (CMU). At in-place concrete or masonry construction, set frames and secure in-place using counter sunk bolts and expansion shields, with bolt heads neatly filled with

metallic putty, ground smooths and primed.

C. …

D. Door Installation: Fit hollow metal doors accurately in their

respective frames, within following clearances ….

(Id. at 38-39.)

Per a requirement in the Subcontract, Whitehead named Oakview as an additional insured under its policy issued by AIIC.  (SSUMF 9-11.)

**B.  <u>The Accident.</u>**

On September 11, 2014, Greg Turner, an employee of Franklin, was working on a rooftop HVAC unit at the Project.  (SSUMF 12.)  Per his deposition testimony, after performing his work, Mr. Turner attempted to leave the job site by walking through a rooftop doorway with a metal frame and door; the door was already open.  (Dkt. 19-3 at 52 [Turner Depo. 47:1-5].)  After walking through the door, he closed it behind him.  (Turner Depo. 54:4-55:14.)  He had to pull twice before he heard the door latch, because the first time he "didn't pull hard enough."  (Id. 55:1-3.)  He then bent down to pick up his tool bag from the ground.  (Id. 55:15-19.)  As he was standing up, the metal frame and door came out of the concrete wall and fell on Mr. Turner.  (Id. 46:4-18, 47:12-14, 54:1-3; <u>see also</u> SSUMF 13-16; Dkt. 24 [photograph depicting door and frame that fell].)

Mr. Turner testified that he had previously operated that door while working at the Project, and when he did so "it seemed to be loose."  (Turner Depo. 49:22-50:2.)  When asked to clarify what aspect(s) of the door seemed loose, Mr. Turner testified, "inside the wall, it appeared to be loose."[3]  (Id. 50:4-5.)  He also testified,

---

[3] Mt. Hawley argues that Mr. Turner testified that the door, not the frame, was loose.  (SSUMF 18.)  In fact, Mr. Turner testified that the door seemed loose "inside the wall" and "inside the fixture."  (Dkt. 19-3 at 61-62 [Turner Depo. 50:4-5; 51:3-5].)  When counsel asked if the "fixture" meant the frame, Mr. Turner said he meant "the concrete."  (Id. 51:4-7.)  He testified that the "door to the frame" felt "solid."  (Id. 50:16-17.)  Thus, Mr. Turner's testimony is that the frame seemed loose in the

4

"As far as the door to the frame, it felt … solid …" and "It just had a slight

wobble… when you closed it …." (Id. 50:16-17, 21-23.)  He further testified as

follows:

> Q. [Y]ou held your right hand up and you went from side to side …
>
>   what does that indicate to you?
>
> A. It indicates that the door was loose inside the fixture, I guess.
>
> Q. The frame?
>
> A. The concrete.  … It wasn't anchored after the door … fell on me, I
>
>   examined the doorway and there was no fasteners to fasten the
>
>   door to the concrete wall.

(Id. 50:25-51:11.)  He continued, "the door made a noise of it … having play, is the

best way I can describe it." (Id. 52:19-21.)

Oakview poured the Project's concrete walls.  (Dkt. 22-5 at 3.)  The parties

agree that the metal door frame was supposed to be placed into the wall panel with

concrete poured around it; then the concrete would dry and the concrete wall with

the embedded door frame could be tilted up into place with a crane.  (SSUMF 41.)

The parties further agree that this did not happen; the frame was not embedded into

the concrete wall when it was poured.  (SSUMF 42.)  This meant that the frame

needed to be securely affixed to the concrete wall after the concrete was set.  (Id.)

The frame, however, was not securely affixed to the concrete wall.  (SSUMF 17,

40.)

Whitehead installed the metal door within its metal frame.[4]  (Dkt. 19-6 at 72,

76 [Whitehead Depo. 55:13-21; 68:21-23]; Dkt. 19-6 at 81.)  The parties dispute,

---

wall, not that the door seemed loose in the frame.

[4] The parties appear to assume that Whitehead installed the metal door after
the frame was installed in the concrete.  The Court therefore treats this fact as
undisputed.

however, who put the metal frame into the concrete doorway.  There is no direct evidence identifying who installed the frame.[5]  Whitehead denies installing the frame.  (Dkt. 19-6 at 83.)  Per Mr. Whitehead, installation of metal frames in concrete walls was not within Whitehead's scope of work; such work is typically done by the concrete contractor.  (Dkt. 22-7 [Whitehead Depo. 16:1-3; 17:22-18:2].)

## C. Mr. Turner's Personal Injury Lawsuit.

In September 2016, Mr. Turner filed a personal injury lawsuit against Oakview and Does 1-50, Oakview's agents (the "Underlying Action").  (SSUMF 20; Dkt. 19-3 at 72 ["Turner Compl."].)  Mr. Turner alleged that all the defendants were responsible for the "construction, control, maintenance, repair, and inspection of doors" at the Project.  (Turner Compl. ¶ 6.)  Mr. Turner further alleged that all the defendants negligently "caused and created" an unsafe condition to exist at the Project: an unsecured metal door.  (Id. ¶¶ 67, 10.)  Mr. Turner alleged that the unsafe condition caused him to "fall violently to the floor after the metal door became separated from the wall" and struck him.  (Id. ¶ 11.)  Due to these events, he suffered bodily injury.  (Id.)

---

[5] By direct evidence, the Court means that there is no testimony from any Project worker saying that he installed the frame or saw who installed the frame; there are no Project notes or logs memorializing who installed the frame or when; there is no evidence describing how the frame and door got from the ground to the roof.  AIIC contends that Oakview installed the frame, citing as supporting evidence Oakview's responses to interrogatories and Mr. Field's deposition.  (Dkt. 22-1 at 25.)  Mr. Field testified that *after* the accident, he told an Oakview employee, "I don't care whose obligation it is, get it fixed."  (Dkt. 22-13 at 4 [Field Depo. 52:17-53:13].)  This testimony has no tendency to show that Oakview placed the frame in the threshold *before* the accident.  Oakview's interrogatory responses identify Oakview as the contractor that fabricated and erected the concrete walls.  (Dkt. 22-5 at 3.)  While this shows that Oakview controlled what was embedded in the concrete walls, it has no tendency to show that after fabricating and erecting the concrete wall without metal door frames, Oakview later placed the frame in the threshold.

In January 2017, Oakview filed a cross-complaint against Whitehead and Franklin for equitable indemnity, express indemnity, contribution, apportionment, and declaratory relief. (SSUMF 21; Dkt. 19-4 at 31 [cross-complaint].)

Mt. Hawley is defending Oakview in the Underlying Action, while AIIC is defending Whitehead. (SSUMF 22-24.) The AIIC-Whitehead policy contains coverage provisions for personal injury claims. (Dkt. 19-5 at 50.) The provisions include the "duty to defend the insured against any 'suit' seeking damages" for bodily injury. (Id.) AIIC owes Oakview this same duty to defend if the terms of the additional insured endorsement are satisfied, i.e., if an act or omission by Whitehead caused the injury, in whole or in part. (Dkt. 19-3 at 41; see also SSUMF 27-28.)

**D. Oakview's Tender.**

In a letter dated January 18, 2017, Oakview tendered its claim to AIIC for defense in the Underlying Action. (SSUMF 29; Dkt. 19-6 at 15 [tender letter].) On February 2, 2017, an AIIC claims adjustor wrote back acknowledging receipt of the claim and an ongoing investigation. (SSUMF 30; Dkt. 19-6 at 19 [response letter].) The adjustor told Oakview that AIIC "can neither accept nor deny your request for tender at this time." (Id.)

On May 3, 2018, AIIC sent Mt. Hawley a letter indicating that it would "address Mt. Hawley's tender" upon reviewing yet-to-be-received discovery in the Underlying Action and concluding its investigation. (Dkt. 19-6 at 22.)

**E. The Instant Lawsuit.**

Mt. Hawley filed the instant lawsuit in January 2018. (Dkt. 1 at 1.) After removal, AIIC answered. (Dkt. 3.) As affirmative defenses, AIIC alleged that there is no evidence that Mr. Turner's accident was caused by acts or omissions of Whitehead. (Dkt. 3 at 5.)

/ / /

/ / /

### III.

### LEGAL STANDARDS

### A. Summary Adjudication Generally.

Under Rule 56 of the Federal Rules of Civil Procedure, a party may move for summary judgment as to a "part of each claim or defense." Fed. R. Civ. Proc. 56(a); see Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378 (C.D. Cal. 1995) ("Rule 56 of the Federal Rules of Civil Procedure allow[s] a court to grant summary adjudication on part of a claim or defense.").

A motion for partial summary judgment or summary adjudication is resolved under the same standard for summary judgment. California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). Summary judgment shall be granted when a movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. In examining the evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence; the court views all evidence and draws all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Id. at

324.

**B. <u>An Insurer's Duty to Defend.</u>**

California law (which applies in this diversity action) requires an insurer to defend any suit "which *potentially* seeks damages within the coverage of the policy." <u>Gray v. Zurich Ins. Co.</u>, 65 Cal. 2d 263, 275 (1966); <u>see also</u> <u>Harbison v. Am. Motorists Ins. Co.</u>, 244 F. App'x 123, 124 (9th Cir. 2007) (applying California law in diversity action disputing duty to defend). As explained by the California Court of Appeal:

> There is no better place to understand the potentiality rule than the nearly half-century-old fountainhead case that gave us the rule: <u>Gray v. Zurich Insurance Co.</u> (1966) 65 Cal.2d 263. There, a policyholder was sued for *assault and battery* — classic intentional torts not covered by insurance policies — after an altercation arising out of an auto accident. The policyholder claimed, however, that he acted in self-defense. The insurance company denied a defense of the lawsuit, reasoning that liability for intentional torts was not covered by the policy. But — insurance law's most cited opinion ever went on to explain — there was a potential that the policyholder might be found liable not for assault and battery, but merely for the *negligent* use of unreasonable force in the altercation. That *potential* liability thus created the possibility of a judgment for a negligent tort, not an intentional one, and *if* the judgment came down that way, the insurance company would have to pay for it. And because the insurance company *might* have to pay for such a judgment, it *definitely* had an obligation to defend.

<u>Griffin Dewatering Corp. v. N. Ins. Co. of N.Y.</u>, 176 Cal. App. 4th 172, 197 (2009).

The potential for coverage under the insuring agreement is determined by facts alleged in the tendered complaint or extrinsic facts known to the insurer.

9

Scottsdale Ins. Co. v. MV Transportation, 36 Cal. 4th 643, 654 (2005). "The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage." Id. at 655. "If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." Id. "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 299-300 (1993).

**C. Summary Adjudication in the Duty-to-Defend Context.**

In the insurance context, summary adjudication can often resolve whether the insurer must defend. See Transamerica Ins. Co. v. Super. Ct., 29 Cal. App. 4th 1705, 1712-13 (1995). Where, as here, the insured is the moving party, he or she has the initial burden of establishing a potential for coverage. See Montrose, 6 Cal. 4th at 300. Once the insured makes the prima facie showing, the insurer faces the same burden it would encounter if it were the moving party—to prove that undisputed facts show there is no possibility of coverage. See id. "In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." Vann v. Travelers Companies, 39 Cal. App. 4th 1610, 1614 (1995).

**IV.**

**DISCUSSION**

AIIC insured Oakview as an additional insured with respect to bodily injury "caused, in whole or in part, by [Whitehead's] acts or omissions." (Dkt. 19-3 at 44.) Mt. Hawley points to four potential ways that acts or omissions by Whitehead

10

caused Mr. Turner's injury and trigged AIIC's duty to defend Oakview:

(1) Whitehead's delivering the metal frames late to the Project, (2) Whitehead's failing to examine the frame before installing the door, in breach of Specifications § 3.1, (3) Whitehead's installing the door negligently (i.e., in a noticeably loose frame), and (4) Whitehead's installing the frame in the concrete wall negligently (i.e., without properly affixing it to the wall).

As to each, AIIC argues that undisputed facts show either (1) Whitehead did not perform the act (or had no legal duty to perform the omitted act), and/or (2) the act or omission did not cause Mr. Turner's injuries.

**A. Late Frame Delivery.**

Witnesses disagree as to why the hollow metal door frame was not embedded in the wall when the concrete was poured. Per Mr. Field's testimony, Whitehead delivered the metal frames and doors to the Project too late for Oakview to embed them. (Dkt. 19-4 at 92 [Field Depo. 21:7-22:12; 28:10-16; 48:19-25].) He recalled talking to Mr. Whitehead or Whitehead's project manager, Mr. Hudgens, about the door frames not being available when it was time to pour the concrete. (Id. 23:6-13.) Per Mt. Hawley, due to the late delivery, "the frame in question could not be properly embedded into the concrete, which consequently required the frame to be affixed to the concrete after it was poured and set. Stemming from this breach, the frame was improperly fixed to the concrete wall and the door installed into this frame allegedly fell on Mr. Turner." (Dkt. 19-1 at 23.)

In contrast, Mr. Whitehead testified that his company delivered the metal frames and doors to the Project early. He testified that when his company picks up frames and doors from a manufacturer, it typically delivers them "straight to the job site" because Whitehead has no place to store them. (Dkt. 19-6 at 57 [Whitehead Depo. 28:24-29:2].) He remembered Mr. Field calling to tell him that the frames

had "sat so long" at the Project that "foam blocking[6] on the back of the hardware locations" had fallen out, and Whitehead needed to secure the foam in place with duct tape before the frames went into walls. (Id. 29:10-18.) He estimated that the frames were at the Project "a couple of months" before that call.[7] (Id. 29:20.) Whitehead duct taped the foam blocks back to the frames, but there is no evidence establishing when that occurred relative to the pouring of the concrete walls. (Id. 30:1-7.)

Mt. Hawley, as the moving party, had the initial burden of establishing a potential for coverage based on undisputed material facts. Here, the material fact of whether there was, in fact, a late delivery is disputed. Thus, the Court cannot grant Mt. Hawley summary adjudication as to this theory.[8]

---

[6] When a concrete wall is poured around a metal door frame, the foam blocks prevent concrete from filling spaces where screws or other hardware will eventually go. (Dkt. 19-6 at 59 [Whitehead Depo. 30:1-7].)

[7] AIIC argues that there is no factual dispute over the timing of Whitehead's delivery of the frames. (Dkt. 22-1 at 21.) According to AIIC, Mr. Field lied or misremembered at his deposition, and his testimony must be disregarded as "inaccurate" where it conflicts with Mr. Whitehead's, leaving Mr. Whitehead's testimony undisputed. (Dkt. 22 at 18.) The Court rejects this argument. See Matsushita, 475 U.S. at 587 (at summary judgment stage, court does not make credibility determinations).

[8] The Court notes that if Mt. Hawley had made such a prima facie showing, AIIC would not have met its burden of showing no possibility of coverage. AIIC argues that Mt. Hawley's causation argument is too speculative, because even if the frame was delivered too late to be embedded in the concrete wall, it could have been securely affixed to the wall after the concrete was set. In support of this argument, AIIC cites Advent, Inc. v. National Union Fire Ins. Co., 6 Cal. App. 5th 443 (2016), a dispute over an insurer's duty to defend under identical additional insured endorsement language. (Dkt. 22 at 13.) In that case, however, there was no evidence presented of a possible causal link; an employee had been instructed to perform a task and apparently deviated from that task without any instruction to do so. Advent is less on-point than another recent case, Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., 5 Cal. 5th 216 (2018). In Liberty Surplus, a 13-year-old student at a school construction project site alleged that a worker sexually abused her; she

**B. <u>Examination of Door Installation Conditions.</u>**

Undisputedly, Whitehead installed the door within its frame. (Dkt. 19-6 at 72, 76 [Whitehead Depo. 55:13-21; 68:21-23]; Dkt. 19-6 at 81.) Under § 3.1 of the Specifications, Whitehead was obligated to "examine supporting structure[s] and conditions under which hollow metal is to be installed." (Dkt. 19-3 at 38-39.) Whitehead was further instructed: "Do not proceed with installation until unsatisfactory conditions have been corrected." Id.

AIIC argues that Whitehead had no legal duty to examine the frame if it was installed by another contractor. (See Dkt. 22 at 12-13.) The language of Specifications § 3.1 required Whitehead to "examine supporting structure and conditions under which hollow metal is to be installed." (Dkt. 19-3 at 38.) Nothing limited this duty to structures installed by Whitehead or conditions caused by Whitehead. The evident purpose of Specifications § 3.1 is to assign to the door-installation contractor the responsibility to examine all site conditions that would determine whether doors may be safely installed.

Mt. Hawley has presented evidence that Whitehead failed to perform this obligation. Mr. Whitehead testified, "I don't recall inspecting that door. I don't recall inspecting any of them at that time. It was so long ago." (Dkt. 19-6 at 70

---

sued the worker's employer. The California Supreme Court ruled that the employer's insurer had a duty to defend the employer, because "a finder of fact could conclude that the causal connection between [the employer's] alleged negligence and the injury inflicted by [the worker] was close enough to justify the imposition of liability on [the employer]." Id. at 225. The California Supreme Court rejected the insurer's argument that the employer's alleged negligence was "too attenuated" from the injury-producing event. Id. While the logical chain of causation between Whitehead's late delivery of the frames and Mr. Turner's injuries is somewhat attenuated, it exists (unlike in Advent). Even if other Project workers could or should have secured the unaffixed door frame, that does not sever the causal chain – just as in Liberty Surplus, where there remained a potential causal connection between the employer's negligence and the sexual abuse, even though others, like school personnel, could or should have prevented the sexual abuse.

[Whitehead Depo. 53:16-18].)  Mt. Hawley argues that this omission potentially caused Mr. Turner's injury.  "Had Whitehead inspected the frame, it would have concluded that the frame was not fixed to the wall."  (Dkt. 19-1 at 22.)

In response, AIIC argues that the Court cannot consider this argument, because the "theory" that Whitehead failed to examine the frame and seek corrective action before installing the door "has not been plead [sic] by either Turner nor Oakview [sic]."  (Dkt. 22 at 14.)  In fact, Mr. Turner alleges that defendants were responsible for the "inspection of doors" at the Project and that defendants' negligence in discharging their responsibilities led to the unsafe condition of the unsecured door.  (Turner Compl. ¶¶ 6-7, 10.)

Mt. Hawley has therefore established a potential for coverage, shifting to AIIC the burden of proving that there is no possibility of coverage.  AIIC argues that even if Whitehead failed to examine the frame, that omission could not have caused the accident, because an examination could not have revealed that the frame was not securely attached to the concrete wall.  (Dkt. 22 at 16.)  In support, AIIC cites Mr. Whitehead deposition testimony, as follows:

A. Because you can't see the concrete inside the frame.  The only thing that would have been obvious would have been if the frame had been loose.  But looking at the pictures there's no concrete in the jamb, obviously, so it didn't get poured in properly.  There's also no anchors anywhere.  It appears that it was just caulking around the frame, which also can be deceiving because caulking can hold a frame really tight.  People are – I think would be surprised how strong caulking is.

Q. Okay.

A. We didn't do the caulking.  We didn't do the painting.  That was all done by somebody else.

Q. Okay.

1      A. So had the painter caulked it, my guys would not have known that

2        it wasn't installed because it would have been locked in place.

(Dkt. 22-7 at 21-22 [Whitehead Depo. 70:12-71:9].) Mr. Whitehead testified that he could tell from the picture of the door in question that it had been caulked prior to falling on Mr. Turner. (See id. at 22 [Whitehead Depo. 71:12-16].)

AIIC has not established with extrinsic facts that there is no possibility of coverage. There is no evidence before the Court establishing when the frame was caulked or whether the frame was caulked before Whitehead installed the door. Mr. Turner testified that the frame felt loose within the wall when he operated the door. His complaint seeks damages related to negligence in inspecting the condition of the doors. Thus, facts stated in or fairly inferable from the complaint suggest a claim potentially covered by the policy.

**C. <u>Door and Frame Installation.</u>**

The Court need not reach the issue of whether Mt. Hawley has met its summary adjudication burden with respect to the door and frame installation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**V.**

**CONCLUSION**

Mt. Hawley has established through undisputed evidence that there is a potential for coverage in the Underlying Action, i.e., a potential that acts/omissions by Whitehead caused, in part, Turner's injuries. As a matter of law, this potential for coverage gives rise to a duty for AIIC to defend Oakview under the additional insured endorsement. Thus, Mt. Hawley is entitled to summary adjudication as to AIIC's duty to defend Oakview in the Underlying Action. AIIC owed Oakview a duty to defend in the Underlying Action arising at the time of Oakview's tender, January 18, 2017.

DATED: October 01, 2018

_____
KAREN E. SCOTT
United States Magistrate Judge